# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### 1:13-cv-333-FDW

| | | |
|---|---|---|
| **TORREY F. WILCOX,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **BETTY BROWN, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** comes before the Court on the parties' Motions for Summary Judgment, (Doc. Nos. 37, 39).

## I.    BACKGROUND

Plaintiff's *pro se* Complaint passed initial review against Marion Correctional Institution Superintendent Randy Teague, Assistant Superintendent Dwayne Terrell, and Offices of Religious Services Head Chaplain Betty Brown, on First Amendment claims that Plaintiff was deprived of a reasonable opportunity to participate in group worship according to his Rastafarian faith during periods of 2013 and 2014. See (Doc. No. 23).

**(1)    Complaint** (Doc. No. 1).

Plaintiff alleges that he is a sincere adherent to the Rastafarian faith. On September 12, 2013, the "administration" at Marion C.I. closed the Rastafarian worship service, refused to provide a certified non-custodial staff member as a monitor for the Rastafarian service, and deprived Plaintiff of a reasonable opportunity to worship according to his Rastafarian beliefs. Defendant Brown authorized Superintendent Terrell and Assistant Superintendent Teague to close

the Rastafarian worship service. Plaintiff submitted grievances that were denied. On December 12, 2013, Defendant Menhinick told Plaintiff that the Rastafarian group service would re-start on December 16, 2013. However, on December 13, 2013, Menhinick told Plaintiff that Superintendent Terrell had made and "executive decision" not to reopen the Rastafarian worship service. (Doc. No. 1 at 5). Defendants' closure of the Rastafarian worship service substantially burdened Plaintiff's free exercise of his religion and caused personal injury and damage to Plaintiff's "mental, emotional, temperament, and personality concerning the reputation and defacement of [his] faith." (Doc. No. 1 at 5). He seeks damages and court costs.

**(2)    Plaintiff's Motion for Summary Judgment** (Doc. No. 37)

Plaintiff argues that he should be granted summary judgment because Defendants' cancellation of Rastafarian worship services placed a substantial burden on his religious exercise. The tenets, beliefs, customs, and practices of his faith require him to observe the sabbath through congregate worship which he was unable to practice when Rastafarian services were discontinued. He further claims that this burden on his religious exercise was not justified by a legitimate penological interest which is evidenced by Defendants' "shifting rationales" for prohibiting Rastafarian worship. (Doc. No. 37 at 10). Prison officials initially claimed that they cancelled Rastafarian services because they lacked a chaplain to oversee the services, then they claimed that they lacked trained staff to supervise the services and, finally, claimed that Rastafari does not have a holy day of worship.

**(3)    Defendants' Motion for Summary Judgment** (Doc. Nos. 39, 41)

Defendants argue that Plaintiff's First Amendment claims for injunctive and declaratory relief are moot because Plaintiff was released from NCDPS custody on August 29, 2018, and further that Defendants Terrell and Teague are no longer employed by NCDPS.

2

The temporary suspension of Rastafarian group worship services at Marion C.I. was reasonably related to legitimate penological interests. Defendants' actions, which followed the NCDPS Religious Practices Manual and Religious Services Policy, were neutral and legitimate. NCDPS's requirement that inmate gatherings are properly monitored and supervised by properly trained correctional staff, qualified religious volunteers, or a qualified inmate faith helper ensures that the gatherings do not disrupt operations and negatively impact safety and security at Marion C.I., and advance the legitimate penological objectives of ensuring that group services are orderly and secure. These rules were not promulgated with any intent to discriminate against Plaintiff or the Rastafarian inmate group. NCDPS's "Religious Practices Guide and Reference Manual" outlines NCDPS policies providing alternative means of exercising religious rights including Rastafarianism and remained open to Plaintiff at all times. The temporary suspension of services was neutral and legitimate as there was not a full-time chaplain at Marion C.I. between September 2013 and December 2013, or a qualified volunteer to moderate the services. There were times when there was not enough correctional staff available to properly supervise all recognized religious faiths, which created an abbreviated chapel schedule between late September 2013 and January 2014, which was intended to ensure institutional safety and security in light of staffing shortages, and not to discriminate against Plaintiff or the Rastafarian faith. Plaintiff had the alternative options to privately conduct his own observances, attend other services, or apply to serve as an inmate leader of the services.

Defendants are entitled to qualified immunity from any claims for damages against Defendants in their individual capacities because Plaintiff has failed to demonstrate a constitutional violation or show that Defendants acted intentionally in depriving him of any rights. Plaintiff cannot demonstrate that Defendants took any actions out of ill-will or animus directed to

him. They were only following the NCDPS policies and procedures and acted neutrally and rationally in carrying them out. Defendants' individual conduct was objectively reasonable in light of constitutional requirements, which Plaintiff has the burden to overcome. No officer or administrative personnel would believe that having to temporarily suspend Rastafarian group worship services due, in part, to the absence of properly trained correctional staff, the retirement of the full-time chaplain, the absence of qualified religious volunteers or a qualified inmate faith helper, would violate Plaintiff's right to freely exercise his religion. Plaintiff has not demonstrated any compensable damages for the alleged First Amendment violation aside from asserting emotional distress or mental anguish. Plaintiff must come forward with a consensus of cases in this jurisdiction establishing the right on which he wishes to rely, which he is unable to do. Plaintiff's claims for punitive damages should be dismissed because no evidence exists of aggravated conduct sufficient to create an issue of fact as to punitive damages.

**(4)** **Responses**

Neither party filed a timely response to the others' Motion for Summary Judgment.[1] See LCvR 7.1(e) (responses to motions for summary judgment must be filed within 14 days of the date on which the motion is served); see also (Doc. No. 31) (pretrial scheduling order providing that responses to dispositive motions must be filed within 14 days of the date on which the motion is filed unless an extension of time is granted). *Pro se* Plaintiff was informed of the importance of responding to Defendants' Motion for Summary Judgment and the legal standard applicable to such a motion. (Doc. No. 42). He was cautioned that his failure to respond would probably result

---

[1] Defendants' Memorandum in support of their Motion for Summary Judgment purports to also "Oppos[e] Plaintiff's Motion for Summary Judgment," however it was filed outside the applicable time limit, Defendants did not request and extension of time, and Defendants have not argued excusable neglect. (Doc. No. 41 at 1).

in the grant of relief that the Defendants are seeking. (Id.).

**(5)** **Evidence**[2]

    **(A)**     **Plaintiff's Declaration** (Doc. No. 37-1)

Plaintiff alleges that Rastafarian worship service was discontinued at Marion C.I. on September 12, 2013 with the explanation that there was lack of a chaplain. On that same date, worship services or Native American, Moorish Science Temple of America, and Al-Islam continued without a chaplain, assisted by a faith helper and supervised by "designated staff (case managers)."[3] (Doc. No. 37-1 at 1). On September 18, 2013, Plaintiff filed a grievance about his inability to worship in accordance with his Rastafarian faith due to the discontinuance of worship services. Jacob Snipes was an approved faith helper during the discontinuation of Rastafarian worship services. (Doc. No. 37-1 at 2); (Doc. No. 37-2 at 1). Plaintiff believes that it is essential to observe the Sabbath through congregate worship and that, during the discontinuation of services, he was not able to worship according to the tenets of his faith. (Doc. No. 37-3 at 3). The ability to attend services of another faith did not provide Plaintiff a reasonable opportunity to worship according to Rastafarian tenets, beliefs, practices, and customs. Chaplain Mark Menhinick told Plaintiff that he had contacted Defendant Brown and was told that Marion C.I. was not required to hold Rastafarian worship services. Menhinick told Plaintiff several times after he became the full-time Chaplain at Marion C.I. that he was ready to begin offering a full schedule of religious services including Rastafarian worship services. Upon information and belief, Defendant Terrell made an executive decision to keep Rastafarian worship services closed even after Chaplain

---

[2] This section is not exhaustive.

[3] According to Plaintiff, "designated staff" are programs staff, case managers, and administrators.

Menhinick was hired full-time. Defendants' "shifting rationales" for the cancellation of Rastafarian services (lack of a full-time chaplain, lack of trained staff to supervise the services, and finally the claim that there is no Rastafarian holy day for worship) demonstrates that the cancellation was pretextual and did not further a legitimate penological interest without a more detailed record. (Doc. No. 37-2 at 5-6). Even if the lack of a supervising chaplain was an actual reason for preventing Rastafarians from worshiping as a group, Defendants still failed to show any legitimate penological justification for why a designated staff could not supervise Rastafarian services as they did for other faiths. (Doc. No. 37-2 at 6). Nor is there any evidence that allowing Rastafarians to worship prior to the cancellation of services ever caused a problem, which suggests that Rastafarian group worship is fully compatible with prison security and management.

Finally, Defendants' contention that Plaintiff could have fixed everything by becoming a faith helper is not supported by the record, which does not set forth the requirements for becoming a faith leader or that Plaintiff met those requirements. Nor does the record show that services would have been permitted without a chaplain to oversee the services even if Plaintiff became a faith helper.

**(B)** **Affidavit of Mark Menhinick** (Doc. No. 40-1 at 1)

Mark Menhinick has been employed with NCDPS as Clinical Chaplain I at Marion C.I. since December 2, 2013. He was a Clinical Chaplain I and II and the Western Youth Institution in Marion, North Carolina from 2007 to 2013. Marion C.I.'s former full-time Chaplain, Nancy Sehested, retired effective August 1, 2013 and Chaplain Sims was out on medical issues. (Doc. No. 40-1 at 3).

As Chaplain at Marion C.I., Menhinick's duties and responsibilities includ ensuring that religious practices of approximately 700 inmates are respected. NCDPS provides written guidance

to NCDPS administrators, chaplains, and other appropriate staff concerning religious practices and paraphernalia. The NCDPS Religious Practices Resource Guide and Reference Manual ("Manual") is written and published by the Division of Prisons Religious Practices Committee and includes a list of faith practices that are officially recognized by NCDPS. The Manual includes a brief description of the basic beliefs, authorized practices, worship procedures, and authorized religious items associated with each faith group. NCDPS recognizes the Rastafarian faith as an approved religion and provides guidance on its basic beliefs, authorized practices, and approved religious property. The Manual provides that corporate (or group or congregate) worship "may be conducted once a week by an approved worship leader chosen for his personal spiritual growth (There is no published mandatory requirement)." (Doc. No. 40-1 at 2). NCDPS policies and procedures related to religious services were not promulgated with any intent to discriminate against Plaintiff or the Rastafarian inmate group. Pursuant to NCDPS Policy and Procedure, "Any offender may privately pray, meditate, and study scriptures or religious literature in his or her cell, so long as the offender does not interfere with other offender(s), the offender's assigned program or work assignments, security or operational management." (Doc. No. 40-1 at 3).

All items that are needed for the performance of corporate or group worship for the Rastafarian faith are being provided when needed by NCDPS. The Chaplaincy department assisted the Rastafarian faith community with all items that were required per policy to meet Plaintiff's religious requirements and needs while he was incarcerated.

Marion C.I. operates its religious service offerings via a posted schedule indicating the days/times that services are offered. During the time when Marion C.I. was without a full-time chaplain, a modified schedule for corporate or group worship was posted. "Because of custody/safety and security issues that must be maintained at all times and the lack of a full-time

Chaplain an abbreviated chapel schedule was implemented from the latter part of September 2013 until January 2014." (Doc. No. 40-1 at 3). While correctional staff can be designated to supervise religious services, "maintaining institutional safety and security is paramount." (Id.).

There was a period following Chaplain Sehested's retirement when Menhinick was coming to Marion C.I. sporadically and was only able to assist in the supervision of Marion inmates minimally. During the time of Marion C.I.'s abbreviated chapel schedule, Menhinick "made a concerted effort to help Rastas at Marion to continue growing their religion by purchasing twelve (12) Rastafarian books for them to check out from the chapel library (December 20, 2013). Rastafarian books were also purchased for the library chapel on February 11, 2014." (Doc. No. 40-1 at 4).

In his role as Clinical Chaplain at Marion C.I., Menhinick was responsible for creating and maintaining a monthly services calendar that establishes a schedule for opportunities for inmates to participate in corporate worship. The schedule shows that Rastafarian services were restarted at Marion C.I. on January 13, 2014. There were no offenders in attendance for Rastafarian corporate services during the latter part of September through December 2013, "due to the fact that Chaplain Sehestead retired and Chaplain Sims was out on medical issues." (Doc. No. 40-1 at 4). During that time, "Marion was running on an abbreviated chapel schedule – offering only those services required by the Religious Practices Manual, and those with an approved volunteer." (Id.). Menhinick traveled to Marion C.I. whenever possible to assist with chaplaincy issues.

There were no Rastafarian services during April 2014 because the Approved Rastafarian Faith Helper was promoted to medium custody and was transferred to another facility. For an approved faith group to meet for corporate services, "the chaplain of that faith group or an approved volunteer must be present to lead the service." (Doc. No. 40-1 at 4-5). For minority faith

groups such as Rastafari, an offender Inmate Faith Helper may be chosen to lead the services. The process for selecting an Inmate Faith Helper is in the Manual and Policy and Procedures. The Inmate Faith Helper Questionnaire gives the chaplain guidance in the selection process. Following the guidance of these resources, the Rastas did not meet until a Rastafarian Faith Helper was approved at the beginning of May 2014, at which time the services resumed.

**(C)** **Affidavit of David Cothron** (Doc. No. 40-2 at 1)

David Cothron is the Marion C.I. Assistant Superintendent of Programs II at Marion C.I., where he has worked as such since October 2016, and has been employed by NCDPS and its predecessor since September 1994.

NCDPS recognizes the constitutional rights of all inmates to practice their faith to the extent consistent with the safety, security, and good operation of the NCDPS prison facilities. NCDPS is duty-bound to ensure the safety and security of those within its custody. It is fiscally and geographically impossible for NCDPS to provide an employee chaplain for each of the numerous religious groups represented by the inmate population. Therefore, to ensure that any gathering of numbers of inmates within the units of Marion C.I. does not disrupt operations and negatively impact safety and security at Marion C.I., congregational or corporate or group worship must be properly monitored and supervised by properly trained correctional staff, qualified religious volunteers, or a qualified inmate faith helper.

Marion C.I.'s prior full-time Chaplain, Nancy Sehested, had retired on or about August 1, 2013, and part-time Chaplain, William Sims, was out on medical issues for much of the period Plaintiff complains about in his Complaint. It is Cothron's understanding that the absence of the full-time Chaplain and sporadic availability of a part-time Chaplain seriously impacted Marion C.I.'s ability to have a person knowledgeable of the Rastafarian faith available to supervise the

Rastafarian faith group as they met together in the Religious Services Center. During the period of time that Marion C.I. was without a full-time Chaplain, it posted a modified schedule for corporate or group worship.

"Because of custody/safety and security issues that must be maintained at all times and the lack of a full-time Chaplain an abbreviated chapel schedule was implemented from about the latter part of September 2013 until January 2014." (Doc. No. 40-2 at 2). While correctional staff were designated to supervise religious services, "maintaining institutional safety and security is paramount, so there were times when there were not enough available Marion correctional staff to properly supervise all recognized religious faiths." (Doc. No. 40-2 at 2-3). Creating and following an abbreviated chapel schedule from the latter part of September 2013 until January 2014 "was not intended to discriminate against Plaintiff or the Rastafarian faith, but to ensure institutional safety and security in light of staffing shortages." Doc. No. 40-2 at 3).

It is Cothron's understanding that Defendant Terrell only worked a very few days in December 2013 and retired from his employment with NCDPS on or about December 31, 2013, and that Defendant Teague was on approved medical leave from November 13, 2013, until early January 2014, and retired from his employment with NCDPS on or about July 1, 2014.

**(D)**     **OPUS Printout** (Doc. No. 40-1 at 8)

Plaintiff was transferred to Marion C.I. on April 3, 2013 and was transferred to Tabor C.I. on October 23, 2014. He was released from NCDPS custody on August 29, 2018.

**(E)**     **NCDPS Religious Practices Resource Guide and Reference Manual** (Doc. No. 40-1 at 9)

NCDPS recognizes the Rastafarian faith as an approved religion. Authorized practices include Private and Corporate worship. Corporate worship may be conducted once a week by an

approved worship leader chosen for his persona spiritual growth. However, "[t]here is no published mandatory requirement" for corporate worship." (Doc. No. 40-1 at 9).

The Manual's Corporate Worship section states:

> There are no required daily religious observances for Rastafarians. Each person is encouraged to create and follow his/her own personal, spiritual walk. There may or may not be a set time to conduct worship. Some consider Saturday a holy day to be used for celebration….

(Doc. No. 40-1 at 12).

**(F)** **NCDPS Policy & Procedures** (Doc. No. 40-1 at 14)

The NCDPS Policy and Procedures provides that specific religious practices and policies are detailed in the Manual. Offenders who wish to have incorporated a religious practice that is not recognized by Prisons "must submit a DC-572 Request for Religious Assistance form to the facility chaplain or other designated staff, who will then consult with the Chaplaincy Services Director regarding the availability of temporary accommodations in conjunction with the facility head or designee." (Doc. No. 40-1 at 15-16); <u>see also</u> (Doc. No. 40-1 at 17-18) ("An offender … whose religious request cannot be met within the framework of existing approved religious services must submit a written request for assistance using the designated DC-572 Request for Religious Assistance: Fact Sheet form."). Determinations regarding temporary accommodations are made on a case-by-case basis and are subject to the operational requirements of each facility. (<u>Id.</u>).

The NCDPS Policy and Procedures provide as follows with regards to Authorized Religious Practices that "Regular population offenders are allowed to attend any corporate worship service held at the facility." (Doc. No. 40-1 at 18). Further, Authorized Religious Practices include:

> (e) Any offender may privately pray, meditate, and study scriptures or religious literature in his or her cell, so long as the offender does not interfere with other

offender(s), the offender's assigned program or work assignments, security or operational management.

(f) Upon request, an offender may be considered for enrollment in religious correspondence courses….

(g) Clergy and other spiritual advisors may be admitted to visit an offender at the offender's request, subject to Prison Policies regarding visitation and coordination of the facility chaplain or other designated staff and approval of the facility head….

(Doc. No. 40-1 at 19).

NCDPS Policy and Procedures provide as follows with regards to Religious Corporate

Services:

(a) To protect the integrity and authenticity of the beliefs and practices of religious services and programs, a Facility Chaplain or designated staff shall be responsible for the coordination, facilitation, and supervision of offender religious services and programs.

(b) If a facility chaplain or community volunteer is not available for a specific minority faith group at least six (6) offenders regularly attend services then an offender faith helper may be considered to assist with facilitation of a religious service or program. The faith group must be listed in the Religious Practices Manual.

(1) Offender Faith Helper is defined as an offender who:

(A) Acts as a facilitator for services of a specific faith group, according to the tenants and authorized practices of the specific faith group as accommodated in the religious practices manual.

(B) Has been designated as such by successfully completing the 'offender faith helper' application process.

(C) As appropriate, serves as the liaison between the offender practitioners of the specific faith group and facility chaplains or designated staff.

(2) The procedures for Offender Faith Helpers are detailed in the Prisons' Religious Policy.

(Doc. No. 40-1 at 19-20).

**(G)    Offices of Religious Services Monthly Report** (Doc. No. 40-1 at 21)

The Marion C.I. Monthly Report for January 2014 completed by Chaplain Menhinick reports that, on the weeks of January 13, "we went back to a full chapel schedule, offering services for … Rastafarian." (Doc. No. 40-1 at 21).

The "Annual Report Combined" section shows that there was no Rasta Service for October, November, or December 2013 but that services resumed in January 2014 and continued through the end of that year. (Doc. No. 40-1 at 22).

**(H)** **Religious Practices Operational Manual** (Doc. No. 40-1 at 23)

The purpose of the Manual is to "provide for the establishment and criteria for inmate faith helpers who may assist with faith-based services for recognized faith groups." (Doc. No. 40-1 at 23). NCDPS "recognizes the constitutional rights of all inmates to practice their faith to the extent consistent with the safety, security, and good operation of Prison facilities." (Id.). NCDPS policy therefore is to "maintain the integrity of each religion by insisting that religious practices conform to the standards established and practiced by the denomination or faith group in question." (Id.). However, "it is fiscally and geographically impossible for [NCDPS] to provide an employee chaplain for each of the numerous religious groups represented by the inmate population. Therefore, to facilitate corporate worship by inmates that both fulfills the inmates' religious needs and conforms to the religion's individual practices, [NCDPS] will permit inmates to serve as faith helpers under the conditions set forth in this policy." (Id.). The "policy" provides that, "[c]onsistent with the safety, security, and good operation of [NCDPS] facilities, an inmate faith helper may be assigned to lead scheduled faith-based programs for faith groups recognized in the [Manual] when neither a Prisons' Chaplain nor religious volunteer is consistently available to provide this service." (Id.).

An "inmate faith helper" is an inmate who:

13

A. Has been designated as such by successfully completing the 'inmate faith helper' application process.

B. Acts as a facilitator for services in a recognized faith group, according to the tenets and authorized practices of the specific faith group as recognized in the Religious Practices Operational Policy Manual.

C. As appropriate, serves as the liaison between the inmate practitioners of the specific faith group and facility chaplains or designated staff.

(Doc. No. 50-1 at 22-23).

A "Facility Chaplain or designated staff shall be responsible for the coordination, facilitation, and supervision of inmate religious services and programs." (Doc. No. 40-1 at 24). If an inmate faith helper conducts a religious service or program, "the inmate faith helper will be supervised, and/or the service will be monitored by a Facility Chaplain or designated staff member." (Doc. No. 40-1 at 25).

## II.    LEGAL STANDARDS

### (1)    <u>Summary Judgment</u>

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fec. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law.  <u>Id.</u>

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party.  The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Id. at 322 n.3.  The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment.  Id. at 324.  The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party.  Anderson, 477 U.S. at 255.  "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"  Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

When confronted with cross-motions for summary judgment, "the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003).

**(2)      Freedom of Religion**

The First Amendment of the Constitution states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. Amend I. The First Amendment applies to the states through the Fourteenth Amendment.  See Everson v. Bd. of Educ., 330 U.S. 1, 15 (1947).  For government conduct to survive scrutiny under the Establishment Clause, "(1) it must have a secular purpose; (2) its principal or primary effect must neither advance nor inhibit religion; and (3) it must not foster an excessive government entanglement with religion." Buxton v. Kurtinitis, 862 F.3d 423, 432 (4th Cir. 2017) (citing Lemon

v. Kurtzman, 403 U.S. 602, 612–13 (1971)); see also Madison v. Riter, 355 F.3d 310, 316 (4th Cir. 2003). To state a free exercise claim under the First Amendment, a plaintiff must allege facts sufficient to show that he held a sincere religious belief, and that the official action or regulation substantially burdened his exercise of that belief. Hernandez v. Comm'r, 490 U.S. 680, 699 (1989). When deciding whether a prison's practice substantially burdens a religious exercise, "courts must not judge the significance of the particular belief or practice in question." Lovelace v. Lee, 472 F.3d 174, 187 n.2 (4th Cir. 2006). A prison policy that substantially burdens an inmate's ability to practice his religion withstands a First Amendment challenge when it is "reasonably related to legitimate penological interests." O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)). In deciding whether a defendant's actions can be sustained as reasonably related to legitimate penological interests, the court must consider the following four factors: (1) whether there is a valid, rational connection between the regulation and the legitimate penological interest; (2) whether there are alternative means of exercising the right in question that remain open to prisoners; (3) the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and (4) whether ready alternatives exist which accommodate the right and satisfy the penological interest. See Turner, 482 U.S. at 89-90.

**(3)** **Sovereign Immunity**

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of Another State, or by Citizens of any Foreign State." U.S. Const. Amend. 11. Thus, § 1983 suits against a state, its agencies, and its officials sued in their official capacities for damages are barred absent a waiver by the State or a valid congressional override.

Kentucky v. Graham, 473 U.S. 159, 169 (1985). "In an official capacity action, the plaintiff seeks damages not from the individual officer, but from the entity for which the officer is an agent." Pusey v. City of Youngstown, 11 F.3d 652, 657 (6th Cir. 1993). "[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity." Graham, 473 U.S. at 166. Therefore, a lawsuit against an officer in his official capacity is, in substance, a claim against the governmental entity and should be subject to the same analysis. See Hutto v. S.C. Retirement Sys., 773 F.3d 536, 549 (4th Cir. 2014) (State officials sued in their official capacities for retrospective money damages have the same sovereign immunity accorded to the State).

**(4)    Qualified Immunity**

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Groh v. Ramirez, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting) (quoting Butz v. Economou, 438 U.S. 478, 507 (1978), for the proposition that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law"). The doctrine of qualified immunity gives officials "breathing room to make reasonable but mistaken judgments about open legal questions." Ziglar v. Abbasi, 137 S.Ct. 1843, 1866 (2017) (quoting Ashcroft v. al–Kidd, 563 U.S. 731, 743 (2011)).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability ... it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis omitted). The "driving force" behind creation of the qualified immunity doctrine was a desire to ensure that "'insubstantial claims' against government officials [will] be resolved prior to discovery." Anderson v. Creighton, 483 U.S. 635, 640, n. 2 (1987). Accordingly, the Supreme Court has "repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227 (1991).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims by determining whether: (1) the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) the right at issue was "clearly established" at the time of defendant's alleged misconduct. While the sequence of the steps set forth in Saucier is "often appropriate," it is not mandatory. Pearson, 555 U.S. at 236. Judges are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Id. For a right to be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640. This includes consideration of the state of the law at the time of the alleged violation as well as the "information possessed" by the officer to determine whether a reasonable official in a particular factual situation should have been on notice that his or her conduct was illegal. Id. at 641. However, an official's subjective belief is irrelevant. Id.

To overcome the qualified immunity defense at the summary judgment stage, the plaintiff must have shown facts that make out a violation of a constitutional right, and the right at issue

must have been "clearly established" at the time of the defendant's alleged misconduct. Thompson v. Commonweath of Va., 878 F.3d 89, 97 (4th Cir. 2017) (citing Pearson, 555 U.S. at 232). The analysis takes place against the backdrop of two dueling interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231.

To determine if the right in question was clearly established, the court first looks to cases from the Supreme Court, the Fourth Circuit, or the highest court of the state in which the action arose. Owens ex rel. Owens v. Lott, 372 F.3d 267, 279 (4th Cir. 2004). In the absence of "directly on-point binding authority," courts may also consider whether "the right was clearly established based on general constitutional principles or a consensus of persuasive authority." Booker v. South Carolina Dep't of Corr., 855 F.3d 533, 543 (4th Cir. 2017); Owens, 372 F.3d at 279 ("the absence of controlling authority holding identical conduct unlawful does not guarantee qualified immunity."). Ordinarily, the unlawfulness of government conduct must be apparent in light of pre-existing law. White v. Pauly, 137 S.Ct. 548, 442 (2017). However, a "general constitutional rule … may apply with obvious clarity ... even though the very action in question has not previously been held unlawful. Hope v. Pelzer, 536 U.S. 730, 741 (2002) (citing United States v. Lanier, 520 U.S. 259, 271 (1997)). Therefore, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. at 741.

### III. DISCUSSION

### (1) Plaintiff's Motion for Summary Judgment

Plaintiff argues that Defendants' temporary cancellation of Rastafarian worship services placed a substantial burden on his religious exercise that was not justified by a legitimate

penological interest, which is evidenced by Defendants' "shifting rationales" for prohibiting Rastafarian worship. (Doc. No. 37 at 10).

Plaintiff's Motion simply restates his First Amendment allegations that were raised in the Complaint. Because Plaintiff failed to fulfill his burden of coming forward with admissible evidence of the material facts entitling him to summary judgment, Defendants were not required to rebut his insufficient showing. See Ray Comm'n, Inc. v. Clear Channel Comm'n, Inc., 673 F.3d 294, 299 (4th Cir. 2012). Plaintiff's Motion for Summary Judgment will, therefore, be denied.

**(2)    Defendants' Motion for Summary Judgment**

To the extent Plaintiff seeks declaratory and injunctive relief, these claims are moot. A prisoner's transfer or release moots a § 1983 request for declaratory and injunctive relief when the conditions of which the prisoner claims are unlikely to recur. See Williams v. Griffin, 952 F.2d 820 (4th Cir. 1991); Taylor v. Rogers, 781 F.2d 1047, 1048 n.1 (4th Cir. 1986). Plaintiff alleged that he was deprived of group worship for portions of 2013 and 2014 and he has now been released from NCDPS's custody. Therefore, his requests declaratory and injunctive relief are moot and Defendants will be granted summary judgment on these claims. Further, to the extent that Plaintiff intended to sue Defendants in their official capacities, his damages claims are barred by sovereign immunity. See Graham, 473 U.S. at 169 Hutto, 773 F.3d at 549.

The only remaining claims, then, are Plaintiff's First Amendment claims against Defendants for damages in their individual capacities. The Court accepts Plaintiff's assertion that weekly group worship is Plaintiff's sincerely held religious belief for purposes of this discussion. See generally Carter v. Fleming, 879 F.3d 132 (4th Cir. 2018) (if a genuine factual dispute exists with regards to whether plaintiff's rights were substantially burdened, defendants can still show entitlement to summary judgment on a free exercise claim by demonstrating as a matter of law that

20

the policy or practice causing the burden was reasonably related to a legitimate penological objective); see, e.g., Murphy v. Missouri Dep't of Corr., 372 F.3d 979 (8th Cir. 2004) (accepting for purposes of summary judgment analysis prisoner/plaintiff's factual assertion that group worship is a sincerely held religious belief of the Christian Separatist Church Society). Plaintiff has sufficiently established that his inability to participate in group worship was a substantial burden on his religious exercise. See O'Lone, 482 U.S. at 345 (implicitly recognizing the substantial burden on Muslim prisoners by a policy that prevented them from attending weekly congregational services but holding that the prison regulations in question did not violate the First Amendment); Parks-El v. Fleming, 212 Fed. Appx. 245 (4th Cir. 2007) (finding that the prisoner/plaintiff successfully alleged a substantial burden with regards to his RLUIPA claim and, by extension his First Amendment free exercise claim, where he asserted that congregational prayer was central to his Muslim faith and that he was unable to engage in congregational prayer because he was barred from the chapel).

Defendants assert that understaffing and the lack of a full-time chaplain between September 2013 and January 2014 and the lack of an inmate faith helper in April 2014 were legitimate penological reasons for suspending Rastafarian group worship services. The Court disagrees.

The evidence establishes that Marion C.I. implemented an abbreviated chapel schedule between September 12, 2013 (following Sehested's August 1 retirement), and Mehinick's arrival as full-time chaplain on December 2, 2013. Plaintiff asserts, and Defendants do not dispute, that Jacob Snipes was an approved inmate helper during the time that Marion C.I. lacked a full-time chaplain. Plaintiff suggests that a reasonable accommodation would have been to provide a staff member to supervise Snipes which would have allowed group services to proceed, as Defendants

did for other religious groups. Defendants' assertion that "*there were times* when there were not enough available Marion correctional staff to properly supervise all recognized religious faiths," (Doc. No. 40-2 at 2-3), is too vague to establish that understaffing precluded Rastafarian group worship services during the entire period at issue. <u>See</u> <u>generally</u> Fed. R. Civ. P. 56(e) (affidavits submitted on summary judgment must contain admissible evidence and be based on personal knowledge); <u>Evans v. Tech. Apps. & Serv. Co.</u>, 80 F.3d 954, 962 (4th Cir. 1996) (an affidavit submitted in support of a motion for summary judgment "must present evidence in substantially the same form as if the affiant were testifying in court," thus they cannot be conclusory or based on hearsay). Defendants' stated legitimate penological basis – the lack of adequate staffing – also fails to excuse the continued lack of group services after Menhinick arrived as full-time chaplain on December 2. Plaintiff asserts, and Defendants do not dispute, that Plaintiff was told the cancellation of group services between December 2, 2013 and January 13, 2014 were the result of administrative decisions rather than understaffing. Defendants have failed to provide an adequate penological justification for the cancellation of services during April 2014 when there was no approved faith helper but during the time that Menhinick was the full-time chaplain. There are thus genuine disputes of material fact regarding the existence of a legitimate penological justification for the cancellation of Rastafarian group worship services during the relevant periods.

Defendants have also failed to demonstrate that they are entitled to qualified immunity. The issue under the particularized facts of the case is whether Marion C.I. was obligated to provide Rastafarian group worship services during periods of alleged understaffing and lack of an approved inmate faith helper. It was clearly established in 2013 and 2014 that the failure to provide group worship services without a legitimate penological justification violated Plaintiff's First Amendment rights. The United States Supreme Court has long held that "reasonable

op[p]ortunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty." Cruz v. Beto, 405 U.S. 319, 322 (1972). As stated in the foregoing discussion, Defendants have failed to demonstrate that understaffing and the lack of an approved inmate helper were legitimate penological justifications for cancelling group worship services during the entire periods at issue.

Defendants' suggestion that they relied in good faith on NDCPS's religious Policy and Manual to determine that Rastafarian group worship services are not mandatory, is unavailing. The Supreme Court and Fourth Circuit hold that religious observances do not have to be uniform to merit the protection of the First Amendment and recognize that differing beliefs and practices are not uncommon among followers of a particular creed. Thomas v. Review Bd. of Indiana Employment Sec. Div., 450 U.S. at 715, 716 (1981) ("it is not within the judicial function and judicial competence to inquire whether the petitioner or [another practitioner] ... more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation."); see also Barrett v. Virginia, 689 F.2d 498, 501 n. 5 (4th Cir. 1982) ("the unchallenged sincerity of plaintiff's religious convictions suffice to invoke first amendment protection."). Defendants' blanket conclusion that group worship is not required for Rastafarians pursuant to NCDPS's religious Policy and Manual, without inquiring into Plaintiff's religious convictions with regards to group worship, was thus contrary to clearly established law at the time. Defendants have not demonstrated that qualified immunity applies under these circumstances.

Therefore, Defendants' Motion for Summary Judgment will be denied on Plaintiff's claims against Defendants in their individual capacities for damages, but will be granted on Plaintiff's claims for damages against Defendants in their official capacities and for declaratory and

injunctive relief. [4]

## IV.     CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is denied. Defendants' Motion for Summary Judgment is granted on Plaintiff's claims against Defendants in their official capacities and for declaratory and injunctive relief and will be denied on Plaintiff's claims against Defendants in their individual capacities for damages.

**IT IS, THEREFORE, ORDERED** that:

1.  Plaintiff's Motion for Summary Judgment, (Doc. No. 37), is **DENIED**.

2.  Defendants' Motion for Summary Judgment, (Doc. No. 39), is **GRANTED** in part and **DENIED** in part as stated in this Order.

Signed: January 9, 2019

Frank D. Whitney
Chief United States District Judge

---

[4] Defendants' arguments that compensatory damages are not available under 42 U.S.C. § 1997e(e) and that there is insufficient evidence to support punitive damages will be reserved for trial.